2010 Ark. App. 138

**DILLARD'S, INC. and Fidelity & Guaranty Insurance Co., Appellants**

v.

**Elizabeth JOHNSON, Second Injury Fund, and Death & Permanent Total Disability Trust Fund, Appellees.**

**No. CA 09–896.**

Court of Appeals of Arkansas.

Feb. 11, 2010.

Kimberly Dickerson Young, James C. Baker, Little Rock, for appellants.

David Lawrence Pake, Gail Owen Matthews, Doralee T. Chandler, Little Rock, for appellees.

DAVID M. GLOVER, Judge.

Elizabeth Johnson sustained an admittedly compensable neck injury on December 31, 2004, while working in retail sales for appellant Dillard's, Inc. The injury occurred when a large metal display rack with a glass top that she and another employee were lifting slipped and fell on Johnson's head. She was approximately forty-six years old at the time of the incident. She has received stipulated benefits related to the injury. In addition, however, she contended that she was entitled to a fifty-five percent whole-body anatomical-impairment rating, as opposed to the uncontroverted ten percent; that she was permanently and totally disabled due to her compensable injury, or, alternatively, that she was entitled to wage-loss disability benefits; that her stroke and seizures, which started on June 29 or 30, 2006, were related to her compensable injury and resulting surgeries; and that she was entitled to psychiatric treatment related to her injury.

The ALJ denied appellee's claims, finding that Johnson sustained an eleven-percent anatomical-impairment but that she was not entitled to any wage-loss disability benefits; that she did not prove her strokes and seizures were compensable consequences of her compensable injury; and that she did not prove psychiatric treatment was reasonably necessary. On appeal, the Commission reversed the ALJ's decision.

Appellants, Dillard's, Inc., and Fidelity & Guaranty Insurance Company, appeal from the Commission's decision, which concluded that Johnson had proven 1) that she was entitled to a permanent impairment rating of twenty-six percent, including compensation for a seizure disorder and spinal stroke; 2) that psychiatric treatment was reasonably necessary in connection with her work-related injury; 3) that she was entitled to twenty-percent wage-loss-disability benefits; and 4) that appellee Second Injury Fund had no liability for the wage-loss-disability benefits award to Johnson. Johnson cross-appeals, contending that the Commission clearly erred in finding 1) that she sustained only a twenty-six percent anatomical impairment because she contends her impairment is greater than twenty-six percent to the body as a whole; 2) that she was entitled to only a twenty-percent wage-loss disability because she contends she was totally and permanently disabled; and 3) that the Second Injury Fund was not liable in this case. We affirm the Commission on direct appeal and on cross-appeal.

### Medical Evidence

Elizabeth Johnson's treatment was extended and extensive. She was treated in the emergency room on January 2, 2005, following the incident at work. Medical

reports from that visit reported that she was positive for muscle spasms in her neck bilaterally and radiating down both arms with soreness of the left side and left arm in the triceps region; that her cervical spine x-ray showed degenerative changes with loss of disc height between C4 and C5; that there was no evidence of subluxation or malalignment in those areas; and that she was diagnosed with a cervical sprain and a scalp contusion. On April 27, 2005, she began treating with Dr. J. Michael Calhoun, a neurosurgeon, and a May 4, 2005 MRI of her cervical spine identified a prominent posterior osseous ridging with a moderate left paracentral-disc protrusion at C5–6 resulting in moderate to severe central-canal stenosis and prominent left anterolateral cord flattening as well as severe left foraminal narrowing; and a small left paracentral disc protrusion at C4–5 causing mild central-canal stenosis and mild left anterolateral cord flattening. Dr. Calhoun reported on that same day that Johnson's MRI showed a large left C5–C6 disc herniation and that he thought her options were to try physical therapy again or surgery in the form of a C5–6 anterior cervical discectomy and fusion. On June 27, 2005, Dr. Calhoun performed a discectomy, foraminotomies, and arthrodesis at C5–6. The pre- and post-operative diagnosis was "Right C5–6 herniated nucleus pulposus." A secondary diagnosis was poorly controlled hypertension. Dr. Calhoun also reported that immediately after surgery, Johnson noticed difficulty with numbness and weakness primarily on her left side, and that she was significantly hypertensive "with blood pressures over 200 systolic," which was controlled with medication.

On July 11, 2005, Dr. Calhoun reported to Dr. Michelle Ibsen that after surgery, Johnson "clearly has a myelopathy"; that she was hypertensive intra- and post-operatively; and that she "potentially could have suffered some cerebrovascular compromise of her spinal cord."

On November 2, 2005, Johnson underwent a functional capacity evaluation, which concluded that "she did not put forth maximal effort on a consistent basis"; that the evaluation was therefore unreliable due to the inconsistencies noted within the report; and that overall, she demonstrated the ability to work at least at the "light" work category over the course of an eight-hour workday.

On May 9, 2006, Dr. Calhoun reported that Johnson awoke from her June 27, 2005 surgery for cervical-disc herniation with numbness and clumsiness in her hands; that she was noted to be unsteady on her feet; that it improved to some degree, but that she still had difficulty with fine-motor movements and disc coordination in her hands along with some unsteadiness on her feet and a tendency to fall. He also reported that he thought those symptoms would persist because the surgery had taken place almost a year earlier. He stated that "[i]t is thought that Mrs. Johnson suffered a 'stroke' of the spinal cord during the surgical procedure. . . ."

On June 27, 2006, Dr. Calhoun operated on Johnson's cervical spine a second time. He reported that her first surgery had occurred a year ago; that she had recently experienced worsening problems with her hands not functioning correctly and had difficulty ambulating; that a repeat MRI showed that a large osteophyte superior to the previous C5–6 diskectomy had formed; that there were some ischemic changes within the spinal cord; and that it was thought that she should undergo repeat surgery to remove her instrumentation and repeat corpectomies with repeat fusion. The pre-operative diagnosis was C5–6 cervical spinal stenosis, status post C5–6 fusion, and cervical myelopathy.

On June 30, 2006, Johnson received emergency treatment. The ER report provided that she presented complaining of passing out; that she had spinal-fusion surgery the previous week; that she had been on pain medication; that on the date of presentation, she had experienced dizziness when she bent over and stood up; that she felt hot and passed out; and that the family reported "she had some twitching and jerking of her arms, but no seizure-like activity," made some snoring noise, and was completely unresponsive for about fifteen minutes. The physician's diagnostic impression was syncope and hypokalemia. On that same date, Dr. David Martin noted that shortly after Johnson was admitted to the floor, the nursing staff witnessed her having a seizure; that she "was postictal for some time"; and that "the seizure lasted about two minutes." Dr. Martin's assessment was new onset seizure, hypertension, and recent spinal-fusion surgery of the cervical spine.

On the same date, June 30, 2006, Dr. Keith Schluterman reported that Johnson had presented "with two likely generalized tonic seizures today," which were without clear recognized precipitant. He stated that he was concerned about staphylococcal meningitis, and that she had been on Demerol, which could have lowered her seizure threshold. He said that her husband suspected some marijuana abuse, that there was no evidence of any stroke at that time, and that her CT scan did not find evidence of abscess. He recommended a lumbar puncture, medication, and an EEG. He interpreted the EEG report as being "essentially normal" in the awake and drowsy state, and that there were "no definitive epileptiform discharges, electrographic seizures or regions of focal slowing." A June 30, 2006 CT of Johnson's head was read as "Negative noncontrast head CT." A July 5, 2006 MRI of her brain showed:

Small to moderate amount of periventricular and subcortical white matter FLAIR and T2 hyperintensities without correlate on other sequences and without enhancement are seen. Within the brain stem, at the level of the pons, there is also a central 1.1 centimeter area of similar abnormal FLAIR signal. No acute infaarct, hemorrhage, mass lesion, mass effect, abnormal extraaxial fluid collection, or hydrocephalus is identified. The vascular flow voids appear preserved bilaterally. Visualized portions of the orbits and paranasal sinuses are clear. Mesiotemporal lobes are normal.

IMPRESSION: Nonspecific periventricular and brain stem gliotic foci. Given the history of head trauma, this may be the etiology, although in the appropriate clinical setting, accelerated small vessel occlusive disease, demyelinating disease, osmotic demyelination, infection, migraines, vasoactive pharmaceuticals or sequelae of vasculitis may need to be considered.

On August 22, 2006, Dr. Calhoun reported to a claims representative that Johnson's restrictions were not to lift or carry more than ten pounds, not to do any over-the-shoulder work, and not to hold her neck in a flexed or extended position for more than two minutes at a time. On January 24, 2007, Dr. Calhoun wrote to a claims representative that he had been asked to review the partial permanent impairment of the whole person given Johnson; that he understood she had been rated ten percent for the first surgery; and that he did not think he had rated her correctly on the second surgery. He continued:

Because she underwent a second operation, this would add 2% partial permanent impairment of the whole person as

documented in Table 15.7 in the Guide to Permanent Impairment of the American Medical Association. Also, I neglected to include the fact that she has difficulty with her upper extremities in regard to dexterity. If this is taken into effect that she has difficulty with both of her upper extremities, as well as some balance problems, according to Table 13.7 of the AMA Guidelines, she is awarded a 39% whole person impairment as well. This would bring her most recent impairment to 41%.

Mrs. Johnson also suffers from anxiety and seizures. In reviewing the mental and behavioral disorder impairment tables, and because I am not usually asked to rate an impairment with regards to this, I can find no specific numbers to give this patient. She also has had some seizures which are secondary, I believe, to her second surgery. According to Table 13.3 in the impairment rating guide, she is awarded another 14% impairment of the whole person. Thus, her total impairment would be 39 + 2 + 14 for a total of 55% impairment of the whole person.

The parties stipulated that Johnson reached maximum medical improvement for her compensable neck injury on January 24, 2007. Dillard's controverted benefits after February 14, 2007. On April 3, 2007, Johnson presented at the emergency room "after having a seizure this morning"; a family member reported Johnson shook, fell back, hit her head, and bit her tongue. It was further reported that Johnson had been "on narcotics and benzodiazepines chronically for a year and her doctor stopped her 'cold turkey' 5 days ago." The ER physician's impression was that of "[s]eizure activity secondary to medication withdrawal." An April 8, 2007 drug screen showed Johnson to be negative for any drugs of abuse, including marijuana.

On June 18, 2007, Dr. Reginald Rutherford performed an independent medical examination and reported in part that it was not possible to formulate an opinion concerning the etiology of Johnson's seizures based on the supplied medical documentation; that CT and MRI studies of the brain did not demonstrate any evidence of traumatic brain injury; that "it is possible that her seizures represent toxic effect from medication for the first two seizures and medication withdrawal for the third seizure"; that the issue should be further addressed via an ambulatory EEG with Dr. Victor Biton; that "[i]f normal I would attribute these seizures to medication effect"; that if epileptiform activity is disclosed then remote effect of head trauma would be the most reasonable explanation and clearly would warrant ongoing use of anticonvulsant medication; and that "this would not be required if the ultimate conclusion is adverse medication effect[s] which would not pose a risk for future seizures...."

In a June 21, 2007 deposition, Dr. Calhoun testified about the June 2005 and June 2006 surgeries. He explained that prior to the second surgery, an MRI showed that Johnson had developed a bony spur that severely compromised her spinal cord; that as a result of the spur, he opined that her spinal cord had developed a "white spot," meaning that part of her spinal cord was not receiving proper blood flow; and that the condition was causing the symptoms of numbness and weakness in the extremities. In response to a question about whether there was any objective medical evidence upon which he could relate Johnson's upper-extremity numbness and dysfunction to a spinal stroke, as opposed to a bone spur, Dr. Calhoun explained:

Well, I mean, it's got to be one of the two things. I don't know. I mean, I

think that clearly after her first surgery, there wasn't a bone spur there. She clearly had some malfunction of her spinal cord then, so I mean, my thoughts are that at least part of her symptoms have to be coming from some kind of compromise of the spinal cord, blood flow or whatever during the first—during or after the first surgery. At least part of her symptoms have to be attributable to that.

He further explained that, because her condition had persisted, he considered it to be permanent. In June 27, 2007 correspondence with Johnson's attorney, Dr. Calhoun acknowledged that he had "put the wrong table down" in his January 24, 2007 impairment rating for Johnson; that the accurate table was 13.17 of the AMA guidelines, which was the criteria for a rating impairment of two upper extremities; and that, "the entire 39% that I mentioned is due to the upper extremity difficulties."

On July 25, 2007, Dr. Gary Souheaver evaluated Johnson and provided a neuropsychology report, the summary of which provided in pertinent part:

In summary, the results of this extensive neuropsychological evaluation were abnormal. The pattern of scores was not specific to a traumatic brain injury residual. In fact, the pattern was from a probable negative response bias by the patient, which resulted in an artificial lowering of most IQ, memory and neuropsychological tests. Such poor test results would be expected for persons who are institutionalized, or who have been declared in need of 24–hour supervision such as nursing home placement. Clinically, and by history, such a description or classification would not be appropriate in this case. Given the history, it is extremely unlikely that the current test results are related at all to such a minor head injury as was described in the records of this case. I strongly suspect this patient's symptoms are related to underlying personality and/or emotional factors, which interact with chronic pain and medications to produce the cluster of complaints and issues reported by Mrs. Johnson.

On September 21, 2007, Dr. Rutherford provided the respondents with an independent medical examination, which provided in pertinent part:

I have received and reviewed the ambulatory EEG performed by Dr. Victor Biton and the independent psychological examination performed by Dr. Souheaver. Ambulatory EEG is negative for a seizure disorder. In this setting I would attribute Ms. Johnson's seizures to adverse medication effect. She does not need to be on an anticonvulsant. Psychological testing as performed by Dr. Souheaver is consistent with somatization disorder which correlates with her FCE pertaining to non-valid profile. There is no evidence for traumatic brain injury.

Ms. Johnson has suffered injury to her cervical spinal cord as outlined in my IME. Fortunately her clinical examination is devoid of objective neurological abnormality and thus while imaging is abnormal clinically Ms. Johnson is not. An impairment rating in this setting is limited to that applicable to one level cervical spinal surgery with second revision surgery. This yields an impairment of 11% representing 9% for the initial surgery and 2% for second surgery drawn form Table 75, page 113 of the AMA 4th Edition "Guides to the Evaluation of Permanent Impairment."

On December 11, 2007, Dr. Bradley Diner performed an independent psychiatric evaluation of Johnson, which provided in part:

[Johnson] required a second surgery for successful structural correction. There is some suggestion that her surgery was complicated by a vascular accident. Despite complaints of memory and functional deficit, neurologic and neuropsychologic evaluations are unremarkable for any residual brain injury.

Ms. Johnson is certainly depressed with neurovegetative symptoms and even some suicidal thoughts. There is no question that her chronic pain syndrome is at least partially explained by psychogenic factors. She has always experienced a significant degree of overlap between pain, anxiety, and depressive symptoms. Her current complaints far outweigh any objective physiologic data. This is consistent with depressive overlay.

I do not believe that Ms. Johnson is malingering, but rather, I think she experiences a significant amount of pain and distress. However, it is my belief that much of these complaints are the result of her psychiatric condition. I am also of the belief that some of her anergia, as well as cognitive complaints are the result of her pain medications, and in the past, her alcohol intake has likely contributed to the same. It is certainly possible that her intake was at least a complication of abrupt withdrawal or intermittent intoxication.

As is noted above, Ms. Johnson has suffered depression for at least the last 16 years, and probably longer. She was marginally controlled with paroxetine and various anxiolytics, however, I doubt she was ever substantially symptom-free. Nonetheless, she was capable of working and maintaining her day-to-day functions. She currently complains of impairment in carrying out her daily living activities and depends on her mother and husband for support. She has little meaningful social contact or enjoyment.

. . . .

Alternatively, I would place her impairment as outlined by the AMA Guidelines as Class 3 (Moderate Impairment) indicating that her depression is compatible with "some, but not all" useful functioning. Her baseline was close to Class 2, suggesting that there has been some worsening of her condition secondary to her injury. With continued depression treatment, she may eventually recover back to Class 2.

Additional medical evidence will be discussed as it pertains to the points raised on direct and cross-appeal.

### Standard of Review

In reviewing decisions from the Workers' Compensation Commission, this court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's decision and affirms if that decision is supported by substantial evidence. *United Farms, Inc. v. Gist,* 2009 Ark. App. 717, 374 S.W.3d 23, 2009 WL 4840206. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* The issue is not whether the reviewing court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, we must affirm the decision. *Id.* Also, when a claim is denied because the claimant has failed to show an entitlement to compensation by a preponderance of the evidence, the substantial-evidence standard of review requires us to affirm if the Commission's opinion displays a substantial basis for the denial of relief. *Flynn v. South-*

*west Catering Co.,* 2009 Ark. App. 641, 2009 WL 3153335.

### Discussion

Appellants' points on direct appeal, and Johnson's points on cross-appeal, are essentially mirror images of each other. The parties have discussed the issues together, and for ease of discussion, we will also.

### Impairment rating

For their first point of appeal, appellants contend that the Commission's finding of a twenty-six percent impairment rating is not supported by substantial evidence because Johnson did not prove that her spinal stroke and seizure disorder were compensable injuries, and those injuries constituted fourteen percent of the total twenty-six percent rating. We disagree.

Concerning the spinal stroke, appellants contend that Johnson failed to present objective medical findings of the existence of a spinal stroke because Dr. Calhoun's testimony was speculative at best, and that she also failed to prove a causal connection between the alleged spinal stroke and her surgery. Concerning the seizure disorder, appellants contend that the record lacks objective medical findings of the existence of a seizure disorder, noting the medical evidence finding normal EEGs and Dr. Souheaver's statement that there were no indications of a lateralized or focal pattern, as would be associated with a stroke residual or seizure disorder, and his opinion that the claimant had not suffered a traumatic-brain injury or developed a resulting seizure disorder from her injury.

Any determination of the existence or extent of physical impairment must be supported by objective and measurable physical findings. Ark.Code Ann. § 11–9–704(c)(1)(B) (Repl.2002); *Avaya v. Bryant,* 82 Ark. App. 273, 105 S.W.3d 811 (2003). The Commission is authorized to decide which portions of the medical evidence to credit and to translate this medical evidence into a finding of permanent impairment using the AMA Guides. *Avaya, supra.*

With respect to the Commission's assessment of a twenty-six-percent impairment rating, the Commission noted that Dr. Calhoun had used the wrong edition of the Guides (5th ed.), but explained how fourteen percent was supportable under the correct edition's (4th ed.) table:

> The authorized Fourth Edition of the Guides contains Table 5, page 4/143, Impairments Related to Epilepsy, Seizures, and Convulsive Disorders. Table 5 assigns up to a 14% impairment for the following impairment description: *"Paroxysmal disorder with predictable characteristics and unpredictable occurrence that does not limit usual activities but is a risk to the patient or limits performance of daily activities."*
>
> . . . .
>
> The Full Commission finds that the claimant sustained a 12% anatomical impairment accepted by the respondents in relation to the compensable surgeries and an additional 14% impairment as a result of the claimant's documented seizure disorder. We find that the claimant's seizure disorder was causally related to the claimant's compensable injury and surgery. The claimant proved that she sustained a 26% anatomical impairment as a result of her compensable injury, surgeries performed by Dr. Calhoun, and causally-related seizure disorder. The claimant proved that the December 31, 2004 compensable injury was the major cause of her 26% anatomical impairment.

(Emphasis added.) Moreover, the Commission does not rely upon the "spinal stroke" in assessing the impairment rating, but rather the "seizure disorder." In

that regard, the Commission found that Johnson received emergency medical treatment for a seizure on June 30, 2006, and hospital personnel witnessed another seizure by her the same day; that Dr. Schluterman opined on June 30, 2006, that she had suffered from two likely seizures; that Dr. Calhoun opined on January 24, 2007, that her seizures were causally related to her second surgery; that an emergency physician opined on April 3, 2007, that her seizure activity was secondary to medication withdrawal; and that Dr. Rutherford independently concluded on September 21, 2007, that her seizures were attributed to adverse medication effect. The medical records relied upon by the Commission constitute objective medical findings that support the Commission's determination regarding the compensability of Johnson's injury.

Furthermore, according to the Guides' table, the recorded episodes suffered by Johnson support a "Paroxysmal disorder [defined as a seizure or spasm—*Dorland's Illustrated Medical Dictionary* (31st ed.)] with predictable characteristics and unpredictable occurrence that does not limit usual activities but is a risk to the patient or limits performance of daily activities." Finally, with respect to appellants' argument that Johnson did not prove that the seizure disorder was permanent, Dr. Calhoun testified that because her condition has persisted, he believed that it was permanent.

■ In short, reasonable minds might accept the evidence relied upon by the Commission as adequate to support the conclusion that Johnson suffered from a seizure disorder, entitling her to an additional fourteen-percent impairment rating, making the total rating twenty-six percent. We, therefore, affirm the Commission on direct appeal regarding this rating.

The Commission, however, rejected Dr. Calhoun's higher whole-person impairment rating of thirty-nine percent. On cross-appeal, Johnson contends that the Commission's decision in that regard is not supported by substantial evidence. We disagree. The Commission's decision displayed a substantial basis for the denial of this relief, concluding that "the evidence in the present matter does not demonstrate that the claimant sustained any permanent impairment to either upper extremity as a result of her compensable neck injury and surgeries." For example, Dr. Calhoun acknowledged that his conclusion concerning Johnson's loss of dexterity in her upper extremities was based upon what she told him, and Dr. Rutherford found her fine dexterous hand movements to be symmetrical.

### Psychiatric treatment

■ For their second point of appeal, appellants contend that the Commission's finding that Johnson satisfied her burden of proving that her psychiatric treatment was reasonably necessary in connection with her work-related injury was not supported by substantial evidence. We disagree.

■ What constitutes reasonably necessary medical treatment is a question of fact for the Commission. *Dalton v. Allen Eng'g Co.*, 66 Ark. App. 201, 989 S.W.2d 543 (1999). In resolving this issue, the Commission stated:

In the present matter, the claimant does not contend that she sustained a mental injury or illness pursuant to Ark. Code Ann. Section 11–9–113. The claimant instead contends that psychiatric treatment is reasonably necessary in accordance with Ark.Code Ann. Section 11–9–508(a). The Full Commission finds that the claimant proved psychiatric treatment was reasonably necessary.

Dr. Diner, a psychiatrist, independently opined on December 11, 2007, that the claimant's condition was the result of her pain medication. The Full Commission finds that psychiatric treatment for claimant is reasonably necessary in connection with the claimant's wide and varied symptoms following her compensable injury.

Appellants argue that "the evidence establishes only that Ms. Johnson has a psychological impairment that existed prior to, and independent of, her injury at Dillard's. Ms. Johnson has failed to submit any medical evidence to prove that psychological treatment was reasonably necessary *in connection with* her work-related injury." Johnson responds by noting that she had never denied having mental difficulties (anxiety and depression) in the past, but that prior to the injury she had been able to function in society. She argues that the compensable injury aggravated her mental problems and caused them to worsen significantly, interfering with her ability to maintain employment.

It is essentially undisputed that Johnson suffers from significant pain. Dr. Souheaver opined that pain makes depression worse and depression makes pain worse, creating "a merry-go-round of stress-related medical problems." Moreover, as noted in Johnson's brief, Dr. Diner also reported that Johnson's psychiatric impairment was raised from a class-two level to a class-three level as a result of her compensable injury. Although appellants note that Johnson had taken a medical leave in 1995 for "multiple medical problems" and that she had suffered severe depression following a layoff from Leisure Arts in 1999, neither point supports a position that she was not able to function in society during those periods to the extent that would cause her to quit her job. As noted by Johnson, depression following a layoff is not the same as having to quit a job because of depression. In short, Dr. Diner's assessment of the effects of appellant's work-related injury on her mental health supports the Commission's finding and reasonable minds could reach the result found by the Commission.

### Wage-loss disability

For their third point of appeal, appellants contend that the Commission's finding that Johnson proved entitlement to wage-loss disability in the amount of twenty percent is not supported by substantial evidence. We disagree.

Appellants' primary argument under this point is based upon their contention that the "Commission's incorrect finding that Ms. Johnson suffers from a permanent seizure disorder tainted its reasoning in evaluating her wage-loss benefits claim." Their argument has previously been disposed of by our affirmance of the Commission on that issue.

Moreover, Arkansas Code Annotated section 11–9–522(b) provides:

In considering claims for permanent partial disability benefits in excess of the employee's percentage of permanent physical impairment, the Workers' Compensation Commission *may take into account, in addition to the percentage of permanent physical impairment, such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his or her future earning capacity.*

(Emphasis added.) The Commission explained its award of wage-loss benefits:

The claimant is now age 50 with only a high school education. The claimant's work history consists primarily of clerical duties and unskilled labor. The claimant began working for the respondents in November 2003 and sustained a compensable injury in December 2004.

We conclude that the Commission's accounting of these additional factors that can reasonably affect Johnson's future earning capacity supports the twenty-percent award.

■ On cross-appeal, Johnson contends that the Commission's rejection of her claim for permanent and total disability was not supported by substantial evidence. We disagree.

The Commission explained its decision not to award permanent and total disability benefits to Johnson by noting that she did not put forth maximal effort in the November 2005 functional capacity evaluation, that she could perform light-work duties for eight hours a day, and that there was no probative evidence of record or credible indication that she was permanently and totally disabled. This explanation displays a substantial basis for the Commission's denial of this relief.

### Second Injury Fund

As their fourth and final point of appeal, appellants contend in the alternative that the Commission erred in finding that the Second Injury Fund has no liability for wage-loss disability benefits awarded to Johnson. We disagree.

In *Mid–State Construction Co. v. Second Injury Fund,* 295 Ark. 1, 5, 746 S.W.2d 539, 541 (1988), our supreme court explained in pertinent part:

It is clear that liability of the Fund comes into question only after three hurdles have been overcome. First, the employee must have suffered a compensable injury at his present place of employment. Second, prior to that injury the employee must have had a permanent partial *disability* or *impairment.* Third, the disability or impairment must have combined with the recent compensable injury to produce the current disability status.

The Commission determined that the evidence did not establish that Johnson had a permanent partial disability or impairment prior to the compensable injury, which is the second of three hurdles that must be met. In addition, the Commission concluded that, even if the claimant did have a prior permanent partial disability or impairment, the record did not show that this disability or impairment combined with the recent compensable injury to produce the claimant's current disability status.

■ We hold that the Commission's decision is supported by substantial evidence. As the Commission explained in its opinion:

[T]he evidence in the present matter does not show that the claimant had a permanent partial disability or impairment prior to the compensable injury. An MRI in March 2001, prior to the compensable injury in 2004, showed mild spondylosis in the claimant's cervical spine. This condition did not arise to a prior disability or impairment. Nor did any of the pre-injury conditions described by Dr. Souheaver in July 2007, including left arm weakness, high blood pressure, or chronic depression, constitute a prior disability or impairment. Even if the claimant did have a prior permanent partial disability or impairment, the record does not show that this disability or impairment combined with the recent compensable injury to produce the claimant's current disability status. The Second Injury Fund is not liable for wage-loss disability benefits in the present matter.

Affirmed on direct appeal and on cross-appeal.

GRUBER and BROWN, JJ., agree.